The PHILADELPHIA HOUSING
AUTHORITY, Appellant,

v.

The FRATERNAL ORDER OF
HOUSING POLICE.

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2002.
Decided Nov. 1, 2002.
Reargument Denied Dec. 27, 2002.

Mary T. Metzler, Philadelphia, for appellant.

Marc L. Gelman, Philadelphia, for appellee.

BEFORE: SMITH–RIBNER, Judge, LEAVITT, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge LEAVITT.

The Philadelphia Housing Authority (PHA) appeals from an order of the Philadelphia Court of Common Pleas (trial court) that affirmed an arbitration award setting aside the discharge of PHA Police Officer Donald Green (Green). Instead, the arbitrator ordered a 90–day suspension, and PHA asserts that the collective bargaining agreement did not authorize the arbitrator to modify Green's discipline in this way. We affirm the trial court.

This case arises out of an arrest made by Green and a fellow PHA officer, Olney Johnson (Johnson), of Charles Duncan (Duncan), who was charged with simple and aggravated assault, resisting arrest and recklessly endangering another person. Duncan's prosecution then became the responsibility of the Philadelphia's District Attorney's Office. Two hearings were scheduled for Duncan's prosecution: the first on December 29, 1999, and the second on February 2, 2000. Green and Johnson were both issued subpoenas to appear at the December 29th hearing. Reproduced Record .143–A, 147–A (R.R.——). However, the District Attorney issued a subpoena only to Johnson for the February 2nd hearing.[1] R.R. 130–A, 137–A. Nevertheless, Green attended both hearings.

Because Green appeared at the second hearing, even though his presence was neither requested nor directed, PHA conducted an investigation to determine whether Green had engaged "theft of court time." Detective Levine reviewed the files in the District Attorney's office but did not find a subpoena directing Green to attend either hearing. However, Detective Levine did find a subpoena in Green's files for the December 29th hearing. As a result of this investigation, the PHA suspended Green immediately with the recommenda-

---

1. The PHA and the Philadelphia District Attorney's Office have a procedure for the subpoena of PHA officers to appear in court. The District Attorney sends the subpoenas to the PHA court liaison office, which issues a notice to the officer directing him to appear in court. When the officer comes to court, he or she reports to the court liaison office, which verifies the time of arrival. After the officer is finished in court, the assistant district attorney writes on the court notice the time the officer was released, and the officer returns the court notice to the court liaison office. This allows the PHA officer to be paid for time spent in court. When the District Attorney's Office does not have time to comply with this procedure, the PHA officer is notified to appear in court and after this appearance, the assistant district attorney completes an "emergency" yellow slip as proof that the officer was in court.

tion of discharge.[2] Ultimately, Green was discharged for theft of court time and falsification of records.[3]

The Fraternal Order of Housing Police (FOHP) filed a grievance challenging Green's termination and submitting it to arbitration. The FOHP and PHA stipulated to the issue for arbitration as follows:

> Whether or not the Philadelphia Housing Authority had just cause to dismiss the grievant from employment. If not, what should the remedy be?

R.R. 21–A.

At the hearing, Green testified that on December 28, 1999, he received a telephone call from "someone" at PHA headquarters telling him to appear in court the next day for the Duncan case. He reported to court the next day, obtained an emergency yellow slip and had the slip signed by an assistant district attorney at the conclusion of his time in court. Green could not recall whether he testified that day and did not know who signed him out that day.

Green then testified that on February 1, 2002, he learned that Johnson had been subpoenaed to appear at the next day's hearing. Accordingly, Green called the District Attorney's Office and confirmed that the hearing was scheduled. He then asked to speak to the assistant district attorney handling the Duncan prosecution and was directed to "a woman;" Green

informed her that he would be needed in court. This unidentified woman directed Green to get an emergency yellow slip and she would have a subpoena issued. Accordingly, Green attended court on February 2, 2000.

Assistant District Attorney Paul McDonald (McDonald) testified that he had been handling the Duncan case since inception and that he had not subpoenaed Green for either court appearance. He had, however, subpoenaed Johnson for the first hearing. He further testified that because the Duncan case had been resolved by Accelerated Rehabilitation Disposition (ARD), the case did not require any witnesses in court. He acknowledged, however, that he signed Green's emergency yellow slip[4] for the February 2nd hearing even though he had not requested Green's presence in court.

After hearing the evidence, the arbitrator concluded that Green's attendance at court at the first hearing may have been authorized because Detective Levine found a copy of a subpoena in Green's files for that hearing. There was no evidence of this subpoena in the District Attorney's files, but PHA did not present any evidence that the subpoena was fabricated. With respect to the second hearing on February 2nd, the arbitrator concluded that Green's attendance had not been au-

---

**2.** The collective bargaining agreement provides that in situations where the intended discipline is discharge, the employee shall receive a 10–day suspension and a notice of intent to discharge him. The discharge will be effective at the end of the suspension unless a grievance is filed within the 10–day period in which case the suspension will continue and the discharge shall not become effective until the grievance is resolved. R.R. 74–A, 75–A.

**3.** Green was discharged for the following violations of PHA Police Department Disciplin-

ary Code: 1.12 Making False Statements in Response to Investigation; 1.15 Making False Entry in Departmental Records or Reports; and 4.20 Failure to Comply with Chief's Directives.

**4.** The District Attorney's Office testified that it is routine for assistant district attorneys to sign emergency yellow slips for cases they are not handling. The signing of an emergency slip does not mean that the officer was asked to appear at the hearing; it merely attests that the officer was present in court. R.R. 24–A.

thorized. This determination was based on McDonald's testimony that he, not a female assistant district attorney, prosecuted the case and that it was resolved by ARD, which did not require any witnesses. The arbitrator noted that although McDonald had signed Green's yellow slip for the second court appearance, this signature attested only to Green's appearance in court and not that his appearance was appropriate. The arbitrator concluded that Green did not engage in "dishonesty" either with respect to his court attendances or the paperwork generated in connection with them.

However, the arbitrator concluded the Green violated PHA regulations regarding court appearances by officers.[5] The arbitrator reasoned that

> There has been no proof of intent to defraud the Employer. Grievant's ego was materially affected when he was not called to testify in the Duncan matter. In both instances Officer Johnson (Green's partner) had informed Green that he had been summoned to appear in court and to testify against Duncan. Green believed that he should have been called, and began a series of calls to put him into the courtroom the following day. This was not intent to defraud or create additional overtime opportunities rather it was Green's manifestations [sic] that this was his case and he should be a part of it.

Arbitrator Opinion at 15, R.R. 34A. In the absence of proof of Green's dishonesty, the arbitrator concluded that the PHA lacked just cause to discharge Green.[6] Thus, the arbitrator ordered the PHA to reinstate Green and pay him back-pay for loss of earnings, except for 90 days immediately after his discharge. Arbitrator Opinion at 17–18, R.R. 36A, 37A. PHA petitioned the trial court to vacate the arbitrator's award, but the trial court affirmed. PHA then appealed to this Court.

On appeal, PHA contends that the arbitrator exceeded his authority by modifying PHA's discipline of Green from a discharge to a 90–day suspension. PHA argues that under the stipulated statement of issue, the arbitrator was limited to determining whether just cause existed to discipline Green. Once he determined that PHA could discipline Green, he was without authority to revise the discipline chosen by the PHA.

The Public Employe Relations Act, popularly known as Act 195,[7] governs public employment and gives employees the right to bargain collectively with their public employers. All public employees are subject to the provisions of Act 195, with the exception of police officers and firemen, who are governed by the provisions of Act 111.[8] However, in *Philadelphia Housing Authority v. Pennsylvania Labor Relations Board*, 508 Pa. 576, 499 A.2d 294 (1985), our Supreme Court held that PHA

---

**5.** Directive 0–40 entitled "Reporting for Court, Responsibilities and Appearance" is a PHA directive that provides the policy for coordinating the scheduling of personnel and obtaining guidance from the district attorney's office for the prosecution of all criminal cases. It provides the operating procedures for all PHA police officers and their supervisors. R.R. 93–A—99–A.

**6.** The arbitrator examined other cases where officers were accused of offenses similar to those charged of Green. Generally, PHA disciplined those officers with a written reprimand or a suspension rather than discharge. R.R. 162–A, 165–A, 182–A, 204–A.

**7.** The Public Employe Relations Act (Act 195), Act of July 23, 1970 P.L. 563, *as amended*, 43 P.S. §§ 1101.101—1101.2301.

**8.** Act of June 24, 1968 P.L. 237, *as amended*, 43 P.S. §§ 217.1—217.10 (Act 111).

officers are governed by the provisions of Act 195, not Act 111.

■■■ The standard of review in cases involving an arbitration award under Act 195 is the essence test. There is a strong presumption that the arbitrator will be the judge of disputes arising under a collective bargaining agreement. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 743 A.2d 405 (1999) (*Cheyney*). Courts must afford great deference to the award of the arbitrator chosen by the parties, and the decision of the arbitrator is final and binding on the parties so long as the arbitrator's award draws its "essence" from the collective bargaining agreement. The "essence test" has been articulated as follows:

> Pursuant to the essence test ... a reviewing court will conduct a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. *That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.*

*Cheyney*, 560 Pa. at 150, 743 A.2d at 413 (emphasis added).

The collective bargaining agreement at issue in this case provides that "[d]isciplinary action shall only be imposed upon an Employee for just cause." R.R. 74–A. The

collective bargaining agreement does not define just cause. However, the collective bargaining agreement defines the authority of the arbitrator as follows:

> *Authority of Arbitrator* The arbitrator *will make findings and render a decision to resolve the grievance.* The arbitrator shall not have jurisdiction to add to, modify, vary, change or remove any terms of this agreement.

R.R. 48–A (emphasis added). The collective bargaining agreement further provides that "[t]he decision of the arbitrator shall be final and binding upon the Employer, the Union and the Employees covered by this Agreement." *Id.*

Under the essence test, there is no basis for this Court to vacate the arbitrator's award. The award is not "genuinely without foundation," and it flows logically from the collective bargaining agreement. *Cheyney*, 560 Pa. at 153, 743 A.2d at 413.

■■■ First, the defined issues fell within the terms of the collective bargaining agreement. The stipulated issue was whether the PHA had *just cause to dismiss Green from employment.*[9] If the PHA did not have just cause, the arbitrator was to find the proper remedy. The collective bargaining agreement eliminates PHA's authority to discipline an employee in the absence of "just cause," and it authorizes the arbitrator to resolve grievances. As any disciplinary action, in particular a discharge, has potential to trigger a grievance, the issue fell within the collective bargaining agreement.

■■■ Second, we find that the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. As noted, an arbitration award must be upheld if it can, in any rational

---

9. The issue was not, as suggested by the PHA, whether the PHA had just cause to discipline Green.

way, be derived from the collective bargaining agreement considering the language of the agreement, context and other indicia of the parties' intentions. *Apollo–Ridge School District v. Apollo–Ridge Education Association,* 799 A.2d 911, 914 (Pa. Cmwlth.2002) (citing *School District of the City of Erie v. Erie Education Association,* 749 A.2d 545 (Pa.Cmwlth.2000), *petition for allowance of appeal denied,* 568 Pa. 674, 795 A.2d 983 (Pa.2000)). Here, the arbitrator interpreted the "just cause" provision of the collective bargaining agreement to mean that there must be just cause for dismissal. The arbitrator found that Green did not engage in theft of court time or falsification of records, but he did violate the PHA's regulations governing officer conduct. The arbitrator held that violating the regulations did not constitute just cause for dismissal. He imposed a ninety day suspension as the "remedy" for violating the PHA regulations.

The parties specifically defined the issue as just cause for dismissal, not just cause for discipline. The parties also agreed that if there was not just cause for dismissal, the arbitrator was to fashion the remedy. PHA is trying to restate the issue, and it is too late to do so. In any case, the collective bargaining agreement does not explicitly reserve to PHA alone the form of discipline to be imposed nor does it limit the arbitrator's authority to impose another sanction. In sum, the arbitrator was permitted to set aside Green's discharge and to impose a suspension once he found PHA lacked grounds to dismiss Green.

PHA directs us to *Township of Penn v. American Federation of State, County and Municipal Employees,* 713 A.2d 1218 (Pa.Cmwlth.1998) to support its argument that once the arbitrator decided that just cause existed *to discipline* Green, he was bound to uphold the discipline chosen by PHA. In *Township of Penn,* the issue before the arbitrator was, as here, whether just cause existed to discharge employee, and, if not, what should the remedy be. The arbitrator found that the employee had engaged in the misconduct for which he was discharged, but disagreed with the sanction of termination. This Court held that the arbitrator, having found that just cause existed, lacked authority to impose a different discipline. The arbitrator's authority was found to be limited by the issue framed by the parties.[10]

Here, however, the arbitrator found Green *did not* engage in the misconduct for which he was discharged, *i.e.,* stealing court time and falsification of records. Accordingly, the PHA did not have just cause to terminate Green under the issue framed by the parties. Instead, the arbitrator found that Green had violated PHA's regulations on officer attendance in court. Because the collective bargaining agreement gave the arbitrator unbounded authority to resolve a grievance, the arbitrator's au-

---

**10.** PHA also relies on *Central Dauphin School District v. Central Dauphin Education Association,* 767 A.2d 16 (Pa.Cmwlth.2001), to support its contention. In *Central Dauphin,* the issue before the arbitrator was whether the School District violated the collective bargaining agreement and *if so,* what should be the appropriate remedy. The arbitrator found that the School District *did not* violate the collective bargaining agreement but he still addressed the remedy issue. Because the parties are bound to the issues submitted, this Court, on appeal, concluded that the arbitrator exceeded his authority by altering the remedy imposed once he found that the School District did not violate the agreement.

Here, the question presented to the arbitrator was whether PHA *had just cause to dismiss Green* from employment and, *if not,* what should be the remedy. The arbitrator found no just cause existed to dismiss Green; therefore, under the issue presented, the arbitrator had the authority to alter the discipline imposed by PHA.

thority to impose a suspension, rather than a discharge, for violation of the PHA's regulations was rationally derived from the terms of the collective bargaining agreement. The suspension had foundation: it was consistent with PHA's practice of reprimanding or suspending officers found to have engaged in conduct such as Green. Because the arbitrator's award drew its essence from the collective bargaining agreement, the trial court appropriately upheld the arbitrator's award.[11]

For these reasons, we affirm the decision of the trial court.

## ORDER

AND NOW, this 1st day of November, 2002 the order of the Philadelphia Court of Common Pleas, dated January 9, 2002, in the above-captioned matter is hereby affirmed.

11. PHA claims that the trial court erred by failing to vacate the arbitration award on public policy grounds. Specifically, PHA contends that Green should be held to the heightened standard of conduct that police officers are held to and, because he was dishonest with PHA, he should be terminated. However, the arbitrator concluded that Green was not dishonest; therefore, we need not address this issue. Further, our Supreme Court elected not to consider public policy arguments in its decision in *Cheyney*, 560 Pa. at 155, 743 A.2d at 417 n. 14. This Court has stated, "where the facts of a particular case do not warrant it, we should not stray far from the well-established case law and principles in the area of public labor relations." *York County Transportation Authority v. Teamsters Local Union No. 430*, 746 A.2d 1208, 1214 (Pa.Cmwlth.2000) n. 13.

PHA also claims that Green forfeited his right to reinstatement by offering false testimony at the arbitration hearing. However, the arbitrator did not find that Green lied under oath; therefore, this argument has no merit.